IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **KERI BOEHM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | 8:12CV198 |
| | ) | |
| V. | ) | |
| | ) | |
| **UNITED STATES POSTAL SERVICE,** | ) | MEMORANDUM AND ORDER |
| | ) | |
| **Defendant.** | ) | |

Plaintiff Keri Boehm ("Plaintiff") brought this action against the United States Postal Service ("Defendant") seeking to vacate an arbitration award, alleging that Defendant breached a collective bargaining agreement and that the National Association of Letter Carriers (the "Union") breached its duty of fair representation. (Filing 34.)

The parties have filed cross-motions for summary judgment. (Filings 41 & 45.) Having fully considered the matter, Plaintiff's Motion for Summary Judgment (filing 41) will be denied, and Defendant's Cross Motion for Summary Judgment (filing 45) will be granted.

**STATEMENT OF FACTS**

1. From 1998 to October 2011, Plaintiff was employed by Defendant as a city letter carrier. At all times relevant to this action, Plaintiff worked at the Saddle Creek Station in Omaha, Nebraska. (Filing 34; Filing 46-5.)

2. Plaintiff was a member of the Union and worked for Defendant under the National Agreement ("collective bargaining agreement" or "CBA") negotiated between the Union and Defendant. (Filing 46-2.)

3. Article 15 of the CBA sets forth a Grievance-Arbitration procedure, which includes the following steps:

      a.      Informal Step A - Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days. The employee may be accompanied by a steward or Union representative. The Union may also initiate a grievance at Informal Step A. If no resolution is met, the Union shall be entitled to file a written appeal to Formal Step A within seven (7) days.

      b.      Formal Step A - A Joint Step A Grievance Form shall be filed with the installation head or designee. The installation head or designee will meet with the steward or Union representative within seven (7) days. The grievant shall be represented for all purposes by a steward or Union representative who has authority to resolve the grievance as a result of the discussions or compromise. The Union representative shall make a full and detailed statement of the facts relied upon, contractual provisions involved, and remedy sought. The Union representative may also furnish written statements from witnesses or other individuals. The employer representative shall make full and detailed statement of facts and contractual provisions. The Formal Step A decision is to be made and the Joint Step A Grievance Form is completed the day of the meeting. The Union may appeal an impasse to Step B within seven (7) days.

      c.      Step B - An appeal from an unresolved case in Formal Step A shall be appealed in writing to the Step B team. The Step B team will review the appeal and issue a joint report of the decision and any supporting findings within fourteen (14) days. It is the responsibility of the Step B team to ensure that the facts and contentions of grievances are fully developed and considered, and resolve grievances jointly. The Step B team may (1) resolve the grievance, (2) declare an impasse, (3) hold the grievance pending resolution of a representative case or national interpretive case, or (4) remand the grievance with specific instructions. The Union may appeal an impasse directly to arbitration within fourteen (14) days after the receipt of the Step B impasse.

      d.      Arbitration - All decisions of an arbitrator will be final and binding.

(Filing 46-6, Attachment B.)

      4.      Article 16.1 of the CBA provides that "[n]o employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage . . . . Any such discipline or discharge shall be subject to the grievance-arbitration procedure provided for in this Agreement. . ." (Filing 46-1, Attachment A.)

5.     On or about April 1, 2011, Roger Humphries ("Humphries"), United States Postal Service Customer Relations Coordinator, received a phone call from Diane Inmann ("Inmann"), the manger of Bath and Body Works in Omaha, Nebraska. Inmann stated that a postal carrier named Keri had been coming to Bath and Body Works in her postal uniform and redeeming $5 coupons. The coupons were good for one per household, and Inmann reported that the carrier in question was bringing them in by the handful, fifteen to twenty at a time. (Filing 46-3, Attachment A.)

6.     Humphries was able to determine that Plaintiff was the carrier in question. Humphries emailed the information from his conversation with Inmann to Special Agent Theresa Myers from the United States Postal Service Office of Inspector General (OIG"). The email was later forwarded to Special Agent Gabriel Ortiz ("Ortiz") of the OIG for further investigation. (Filing 46-3.)

7.     On April 21, 2011, Ortiz interviewed Inmann who positively identified the carrier in question as Plaintiff. On the same day, Ortiz spoke with Don Allmon ("Allmon"), Manager of Customer Service at the Saddle Creek Station. Ortiz informed Allmon that he was investigating a customer report concerning possible mail theft by a carrier. Ortiz requested information about Plaintiff, and instructed Allmon to keep the investigation confidential. Ortiz continued his investigation of Plaintiff from April to July, 2011. (*Id.*)

8.     On July 21, 2011, Ortiz and Meyer went to the Saddle Creek Station to interview Plaintiff. (*Id.*) At the arbitration, the Union and Defendant stipulated to the fact that prior to the interview, Plaintiff asked Allmon "Do I need a Steward?" and Allmon replied, "I don't know. I am not the one conducting the interview." (Filing 46-1.) Plaintiff did not request a Union steward or ask Ortiz whether she needed one during the interview. The interview proceeded without a Union steward present. (Filing 46-3.)

9.     During the interview with Ortiz, Plaintiff admitted that she had taken coupons from the bin of Undeliverable Bulk Business Mail ("UBBM"), including coupons from Bath and Body Works and Victoria's Secret. She admitted that she had redeemed coupons while still in her uniform. (*Id.*)

3

10. UBBM is third-class mail that cannot be delivered for a variety of reasons, including, but not limited to, relocation by residents. (Filing 46-3.) At the Saddle Creek Station, UBBM was put into yellow bins located at each workstation. Carriers placed UBBM into the bins. On a daily basis, a clerk assigned to UBBM would sort through the bins to make sure everything in it was appropriately UBBM. The clerk also looked for items of value, such as pens, calendars, and samples. The clerk placed goods that could be reused into a collection box. Samples such as cereal, soaps, lotions, etc. would be donated to charity. Items such as pens, pencils and calendars would be used for business purposes at the Saddle Creek Station. (Filing 46-1; Filing 46-4; Filing 46-5.)

11. The Postal Service has six policy manuals that employees must comply with. In 2011, one such policy manual, the Postal Operations Manual ("POM"), provided that "[e]mployees are not permitted to remove undeliverable mail and/or waste or waste receptacles from postal facilities for personal use or for any use not authorized by the Postal Service." Sections 691.533.a. and 691.522.c. of the POM in effect during 2011 provided that undeliverable merchandise, product samples, and cosmetics should be disposed of by donating to public and charitable organizations that agree to distribute the products for free. Section 691.45 of the POM further provided that items other than money and uncanceled stamps could be reused for business purposes only. (Filing 46-6, Attachment E; Filing 46-4, Attachment B.)

12. Following Ortiz's interview with Plaintiff on July 21, 2011, Ortiz briefed Allmon regarding Plaintiff's statements. Allmon, after consultation with Labor Relations and Postmaster Keith Reid ("Reid"), placed Plaintiff was on Emergency Placement, pending an investigation. (Filing 46-4.)

13. On or about August 29, 2011, Ortiz issued an investigative report. The report stated, in part, as follows:

> The OIG investigation revealed that for a period exceeding a year, [Plaintiff] removed and redeemed multiple pieces of Standard Class Mail which contained coupons to Bath and Body Works, Victoria's Secret, and JC Penney's. [Plaintiff] admitted she removed the mail, which was intended for residents serviced by the Saddle Creek Station, form Undeliverable Bulk

>Business Mail (UBBM). Moreover, [Plaintiff] admitted to soliciting for additional coupons from customers on her route, while in uniform and on duty. While [Plaintiff] was unable to provide a total value in items received as a result of redeeming the coupons, [Plaintiff] stated, "If they want me to pay it back, I will."

(Filing 46-3, Attachment C.)

15. 14. On September 9, 2011, following receipt of Ortiz's investigative report, Plaintiff's supervisor, Keith Sucha ("Sucha"), conducted an investigative interview with Plaintiff. Union steward, Chris Grunke (Grunke"), was present. Plaintiff admitted to taking coupons from the mail and redeeming them at shopping malls. She further admitted that she redeemed coupons while in her uniform. (Filing 46-5.)

15. On September 15, 2011, Sucha spoke with Ortiz regarding his investigative report. On that date, Sucha also interviewed Inmann, as well as another Bath and Body Works employee who told Sucha that Plaintiff had been coming into the store with multiple coupons for many months. (*Id.*)

16. On September 27, 2011, Sucha conducted a pre-disciplinary interview with Plaintiff. Grunke was present. Plaintiff was questioned regarding how she came into possession of the coupons. Plaintiff again admitted to taking the coupons from the mail. (*Id.*)

17. On October 5, 2011, Sucha submitted a Disciplinary Action Proposal, recommending that Plaintiff be removed from her position. Allmon reviewed the Disciplinary Action Proposal and agreed with Sucha's recommendation to terminate Plaintiff. On October 26, 2011, Sucha issued a Notice of Removal to Plaintiff, based on the Charge of Unacceptable Conduct - Conversion of Property. The Notice of Removal stated that Plaintiff was in violation of Section 665.13 of the Employee and Labor Relations Manual ("ELM"), which states that employees are expected to discharge their assigned duties conscientiously and effectively. The Notice of Removal further provided that Plaintiff had violated Section 274.1 of the Administrative Support Manual ("ASM"), which states that the Postal Service must protect the sanctity of the mail and any postal employee who violates the

5

sanctity of the mail is subject to administrative discipline, criminal prosecution, or both. (Filing 46-4; Filing 46-5, Attachment C.)

18. During Informal Step A and Formal Step A of the grievance procedure, Plaintiff was represented by Grunke. On or about October 31, 2011, November 2, 2011, November 4, 2011, and November 15, 2011, Grunke requested documents from Sucha regarding the Notice of Removal. (Filing 46-2.)

19. Throughout the month of November, 2011, Grunke interviewed individuals regarding Plaintiff's grievance. On or about November 3, 2011, Grunke interviewed Saddle Creek Station employees Laurie Baratta, Kevin Bowyer, and Tina Cameron regarding the handling of UBBM at the Saddle Creek Station. None of these employees admitted to taking coupons from the UBBM. Grunke also interviewed Saddle Creek Station employee Mary Edmonds and Zigmund Jedlecki regarding securing the Saddle Creek Station and the outside gates. Grunke interviewed Allmon on November 3, 2011, and Sucha on November 7, 2011. Grunke interviewed Inmann on November 18, 2011. (*Id*.)

20. On or about November 10, 2011, the Union initiated a grievance on behalf of Plaintiff, objecting to Plaintiff's removal. The grievance was not resolved during Formal Step A or Step B of the grievance procedure. The Union requested arbitration of Plaintiff's grievance on or about January 20, 2012. (Filing 46-6.)

21. The arbitration hearing was held on May 2, 2012. J. Mark Sims ("Sims") represented the Union during the arbitration process. Sims has represented the Union during arbitrations since 2000. (Filing 46-1.)

22. The Union argued at the arbitration that there was not "just cause" to issue the Notice of Removal. Specifically, the Union asserted that Defendant's actions were untimely and that a thorough investigation was not completed. The Union also maintained that the severity of the discipline was not reasonably related to the infraction and was not in line with those usually administered. (Filing 42-2; Filing 46-1.)

23. The Union further asserted that Plaintiff's rights under *NLRB v. J. Weingarten,*

*Inc.*, 420 U.S. 251 (1975)) ("Weingarten")[1] were violated prior to her being interviewed by the OIG. The Union argued that Allmon was aware of the nature of the OIG inquiry and should have provided Plaintiff a union steward when she asked if she needed one and also should have informed Plaintiff as to the reason for the interview. (Filing 42-2; Filing 46-1.)

24. During the arbitration process, Plaintiff informed Union representatives that she was allegedly the victim of disparate treatment because other employees had taken items from UBBM and were not disciplined. Plaintiff did not provide any names of employees who had taken UBBM. Sims determined that there was insufficient evidence to support a defense based on disparate treatment. To date, Plaintiff has not provided the names of other employees who purportedly took items from UBBM for personal use. Plaintiff has stated that she will not provide any names until she is granted another arbitration. (Filing 46-1; Filing 71-1.)

25. On or about May 19, 2012, the Arbitrator denied Plaintiff's grievance. The Union did not appeal the Arbitrator's decision. (Filing 42-2; Filing 46-1.)

26. Plaintiff filed this action on June 11, 2012, seeking to vacate the arbitration award. Plaintiff amended her Complaint on March 6, 2013, alleging that Defendant breached the CBA and that the Union breached its duty of fair representation. Plaintiff also asserts that the arbitration award should be reversed based on a national public policy requiring Defendant to provide Weingarten rights to employees such as Plaintiff. (Filing 1; Filing 34.)

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

---

[1] Under *Weingarten*, employees have the right to have a union representative present during an investigatory interview.

In order to withstand a motion for summary judgment, the nonmoving party must substantiate its allegations with "sufficient probative evidence [that] would permit a finding in [its] favor on more than mere speculation, conjecture, or fantasy." *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quotation omitted). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## DISCUSSION

Courts have "a limited role when asked to review the decision of an arbitrator." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987). "An arbitration award must be confirmed as long as it 'draws its essence' from the parties' agreement." *U.S. Postal Service v. American Postal Workers Union*, 907 F. Supp.2d 986, 993 (D. Minn. 2012). "[A] federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." *U.S. Postal Service v. American Postal Workers Union*, 553 F.3d 686, 689 (D.C. Cir. 2009) (quotation and citation omitted).

In order for Plaintiff to succeed in this action, she must first demonstrate that the Union breached its duty of fair representation. *Moore v. U.S. Postal Service*, 992 F.2d 180, 181 (8th Cir. 1993). "Breach of the duty of fair representation by the union is a condition precedent to [the employer's] liability on [the employee's] claim . . . for breach of the collective bargaining agreement." *Smith v. United Parcel Service, Inc.*, 96 F.3d 1066, 1069 (8th Cir. 1996). A union will be found to have breached its duty of fair representation when its conduct toward to member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). "Mere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation." *Buford v. Runyon*, 160 F.3d 1199, 1202 (8th Cir. 1998). "Any substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of the bargaining responsibilities." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991).

Plaintiff claims that the Union breached its duty of fair representation by acting in bad faith and by handling her claim in a perfunctory manner. Plaintiff argues that the Union improperly handled her claim by failing to investigate Plaintiff's allegation that other postal employees used discarded coupons without being punished, and by failing to make this argument during the arbitration. Plaintiff further asserts that the Union acted in a perfunctory manner by failing to properly research and investigate Plaintiff's assertion that her Weingarten rights had been violated. In particular, Plaintiff claims that the Union should have been aware of a postal policy requiring employees to be notified in advance of an interview which could result in discipline and that the Union mishandled her claim by failing to argue that Plaintiff had not been so notified. Plaintiff also maintains that Sims' presentation to the Arbitrator was deficient because he only asked Plaintiff to answer three questions and did not ask Plaintiff to explain, for instance, discrepancies in her responses to previous interview questions.

The evidence does not support the conclusion that the Union breached its duty of fair representation or otherwise acted in a perfunctory, arbitrary, or discriminatory manner by refusing to argue that other employees were taking items from the UBBM. It is undisputed that Plaintiff told Union representatives during the arbitration process that other employees had taken items out of UBBM. However, Plaintiff did not specifically identify any such employees and, to date, refuses to identify any such individuals. Grunke investigated Plaintiff's claims by asking several employees whether they had taken items from the bins. These employees responded that they had not taken any such items. Allmon and Sucha testified that they were unaware of any employees at the Saddle Creek Station who had taken items out of UBBM for personal use. Although Allmon averred that items such as pens, pencils, and calendars were removed from UBBM bins and used for business purposes, these actions did not violate Postal Service policy. In sum, there is no credible evidence that the Union or management had actual knowledge that other employees were taking items out of UBBM for personal use at the time of the arbitration.

Given the lack of credible evidence at the time of the arbitration that other employees improperly removed items from the UBBM for personal use, the Union can hardly be found to have acted arbitrarily by refusing to raise this issue. "A union's conduct is arbitrary if, considering all the circumstances at the time of the union's actions, its behavior is so far

outside a wide range of reasonableness as to be irrational." *Buford*, 160 F.3d at 1202 (internal quotation and citation omitted). Moreover, the Union did not act unreasonably, discriminatorily, or otherwise in bad faith by choosing not to advance an unsubstantiated argument during the arbitration process. *See Gaston v. Teamsters Local 600*, 614 F.3d 774, 778 (8th Cir. 2010) (stating that a showing of bad faith "requires proof of fraud, deceitful action, or dishonest conduct") (quotation and citation omitted).

Sims' determination that there was insufficient evidence to present an argument regarding other employees' alleged behaviors with respect to UBBM is entitled to considerable deference. *See Gaston*, 614 F.3d at 778 ("Unions are afforded considerable deference in executing their duty of fair representation"). At most, Sims' decision not to pursue a defense for which he had little or no evidence was a tactical error. "Tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Nicholls v. Brookdale University Hospital and Medical Center*, 204 Fed. Appx. 40, 42 (2d Cir. 2006) (quotation and citation omitted).

Additionally, even if there was some credible evidence that other employees were taking UBBM for personal gain and that management was aware of this practice, the Union was not required to advance such a claim simply because Plaintiff wanted it raised. Arguably, doing so would not have been in the best interest of other members of the Union. *See Sheet Metal Workers Local No. 2 v. Silgan Containers Manufacturing Corp.*, 690 F.3d 963, 969 (8th Cir. 2012) (stating that "[i]n deciding whether to bring a grievance, for instance, the Union considers not only whether the individual employee wishes to pursue that grievance, but also whether such a grievance is in the interests of the represented employees as a whole"). The Court finds that the Union did not breach its duty of fair representation by failing to advance the argument that other employees were allegedly taking items from the UBBM for personal use.

The Court likewise finds Plaintiff's claims that the Union acted in a perfunctory manner by failing to properly investigate the alleged violation of Plaintiff's Weingarten rights without merit. The Union raised the issue of a purported violation of Plaintiff's Weingarten rights at the arbitration. A review of the Arbitrator's decision shows that the Arbitrator carefully considered the Union's arguments, but found no violation because

Plaintiff decided to proceed with the interview without a steward present. Although Plaintiff may have desired that the Union present additional information, evidence or argument regarding the Weingarten issue, this circumstance does not constitute a breach of the Union's duty to fairly represent Plaintiff. *See Buford*, 160 F.3d at 1202 (stating that "[m]ere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation"). The Union did not act in bad faith or otherwise display deceitful or dishonest conduct in connection with its presentation of the Weingarten issue.

Similarly, the fact that Plaintiff would have liked to be asked more questions during the arbitration does not support Plaintiff's claim that the Union acted in a perfunctory manner or otherwise breached their duty of fair representation. The Union made multiple arguments on Plaintiff's behalf. In addition to arguing that Plaintiff's Weingarten rights had been violated, the Union asserted that Defendant's actions were untimely and that a thorough investigation was not completed. The Union also maintained that the severity of the discipline was not reasonably related to the infraction and was not in line with those usually administered. It is apparent from the arguments advanced by the Union that Sims spent time preparing for the arbitration, and considered the strategy to be employed and the best arguments to advance based on the facts of the case. The Union and Sims did not simply go through the motions when representing Plaintiff.

In support of her position that Sims did not adequately prepare for the arbitration, Plaintiff points to an email purportedly written by Yolanda Williams ("Williams"), which states that Sims' presentation to the arbitrator was "weird." (Filing 42-4.) Williams is a Labor Relations Specialist employed by Defendant. Williams has averred, however, that the statements in the email were her own personal views, and not those of Defendant. Williams did not discuss the Union's strategy with Sims and was not privy to any investigation done by the Union. (Filing 46-6.) Williams' purported personal opinion contained in the email does not support the conclusion that Sims' actions and those of the Union in representing Plaintiff were perfunctory or otherwise deficient.

Finally, the Court finds that the Union's decision not to appeal the Arbitrator's decision did not violate its duty of fair representation. The Union had no duty to appeal the award, and did not act unreasonably in not doing so, particularly in light of the CBA's

provision that an arbitrator's decision is final and binding.

For the reasons explained above, the Court concludes that the Union did not breach its duty to fairly represent Plaintiff. Because the Court finds that the Union did not breach its duty of fair representation, the Court need not, and will not, address the issue of whether Defendant breached the collective bargaining agreement.

In her Complaint, Plaintiff also alleges that the arbitration award should be vacated based on a national public policy requiring Defendant to provide Weingarten rights to employees such as Plaintiff. A court may vacate an arbitration award if the award violates an "explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *United Paperworkers*, 484 U.S. at 43 (quotations and citations omitted). Here, there has been no showing that the Arbitrator's award violates an explicit, dominant public policy. The Eighth Circuit Court of Appeals has found that a violation of Weingarten rights does not require reinstatement, which is what Plaintiff sought in the arbitration, when the employee is fired for just cause. *Montgomery Ward & Co. v. NLRB*, 664 F.2d 1095, 1096-97 (8th Cir. 1981). The Arbitrator found that Plaintiff was removed for just cause, and this decision clearly draws its essence from the collective bargaining agreement. The Arbitrator defined "just cause" by using the definition provided in the Joint Contract Administration Manual and determined that just cause existed based on the regulations in the ASM. Plaintiff's assertion that the Arbitrator's decision violates public policy is without merit.

## CONCLUSION

For the reasons explained above, Plaintiff's Motion for Summary Judgment (filing 41) is denied and Defendant's Cross Motion for Summary Judgment (filing 45) is granted. Judgment will be entered by separate document.

Plaintiff's Motion to Allow Use of Testimony of Daniel Greenfield, David W. Black, Sr. and J.J. Jackson for Impeachment Purposes (filing 57) and Defendant's Motion to Strike

([filing 61](#)) are denied as moot.[2]

      **IT IS SO ORDERED.**

      **DATED November 12, 2013.**

                               **BY THE COURT:**

                               **S/ F.A. Gossett**
                               **United States Magistrate Judge**

---

[2] The Court has reviewed the submissions of the parties with respect to these motions, including the testimony at issue. Assuming, without deciding, that this testimony is admissible, it does not aid Plaintiff in overcoming Defendant's summary judgment motion. In other words, this testimony does not create a genuine issue of material fact precluding the entry of summary judgment in favor of Defendant.